# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| GREGORY KELLEY, PAIGE KELLY, MYRA GLASSMAN, MARSHALL MAUER, BARRY CARR, AND MOSHE DAVIS, as TRUSTEES OF SERVICE EMPLOYEES INTERNATIONAL UNION HEALTHCARE IL HEALTH AND WELFARE FUND, <br><br> and <br><br> Plaintiffs, <br><br> v. <br><br> MAILFINANCE, INC. and NEOPOST USA, INC. <br><br> Defendants. | Case No.: 19-cv-758 |

## COMPLAINT FOR INJUNCTION, DECLARATORY JUDGMENT AND OTHER RELIEF

Plaintiffs Gregory Kelley, Paige Kelly, Myra Glassman, Marshall Mauer, Barry Carr, and Moshe Davis, as Trustees of the SERVICE EMPLOYEES INTERNATIONAL UNION HEALTHCARE IL HEALTH AND WELFARE FUND ("Fund"), by and through their attorneys, Dowd, Bloch, Bennett, Cervone, Auerbach & Yokich, by way of their complaint against Defendants MAILFINANCE, INC. and NEOPOST USA, Inc. state as follows:

### IDENTITY OF PARTIES, JURISDICTION, AND VENUE

1. The Fund is a multiemployer benefit plan within the meaning of Sections 3(3) and 3(37) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1002(3) and (37A). The Trustees and the Fund maintain offices and conduct business within this district.

2. The Fund shares office space and shares administrative expenses with the Service Employees International Union Healthcare IL Pension Fund ("Pension Fund"), and the SEIU Healthcare IL Home Care and Child Care Fund ("Home Care Fund"), collectively known as the SEIU Healthcare IL Benefit Funds (hereinafter, collectively referred to as "SEIU Funds").

3. The Pension Fund and Home Care Fund are also multiemployer benefit plans within the meaning of Sections 3(3) and 3(37) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1002(3) and (37A).

4. Defendant MailFinance, Inc. is a California corporation with a principal place of business and registered address of 478 Wheelers Farm Road, Milford, Connecticut 06461, and which is registered to do business in Illinois.

5. Defendant Neopost USA, Inc. ("Neopost") is a Delaware corporation with a principal place of business at 476 Wheelers Farms Road, Milford, Connecticut 04641, and which is registered to do business in Illinois.

6. Defendant Neopost does business in Illinois as, among other names, Neopost Great Lakes, which is a name in which it is not registered to business in Illinois.

7. Jurisdiction and venue are vested in this Court under ERISA Sections 502(a)(3), 29 U.S.C. § 1132(a)(3).

8. The Court also has subject matter jurisdiction over this action as the parties are citizens of different states and the amount in controversy exceeds $75,000.

9. Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

10. Jurisdiction to issue the remedy sought herein is also provided in the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.

**FACTS COMMON TO ALL COUNTS**

11. The Funds provide health, welfare and pension benefits to approximately 20,000 participants and their beneficiaries, which are funded through contributions from the employees and their employers pursuant to the terms of collective bargaining agreements.

12. The Funds collectively spend more than $100,000 per year on postage and mailing fees in order to meet their various obligations under ERISA, including but not limited to processing claims for benefits and complying with annual reporting and disclosure obligations.

13. In August 2017, the Fund contracted with Defendants to help the SEIU Funds meet their mailing and printing logistical needs. The contract was to have a hardware component, in which the Fund would lease a mailing and postage machine from Defendants, and a software component. Defendants contracted to develop a customized software to be integrated with the hardware to meet the SEIU Funds' specific printing and mailing needs. The customized software was intended to among other benefits, provide various sorting, double-sided printing, and mail-merging benefits that would significantly reduce both the Funds' mailing and printing costs as well as the intensive manual labor associated with such tasks.

14. Defendants estimated that by using their hardware and customized software, the Fund could save approximately $2,000 per month in printing and mailing costs.

15. The Fund, on behalf of all SEIU Funds, and Defendants entered into a "Software Solutions Finance Agreement" attached hereto as Exhibit A ("Finance Agreement") effective August 23, 2017. The Finance Agreement provided for 60 monthly payments of $2,815.01, which covered a 60-month lease of postage and mailing equipment in addition to the agreement to create customized mailing software for the Funds pursuant to a "Scope of Work" agreement entered into in August 2017, and a "Solution Design" agreement finalized in January 2018,

3

(hereafter referred to as "Customized Design Agreements") which contain the terms specific to the customized software that Defendants agreed to create for the Fund, including the agreed-upon schedule for completing the customized software.

16. The Fund would not have leased the specific model of hardware from Defendants if not for Defendants' representations that a customized software could be developed for use with the hardware. The Fund had to spend approximately $1,200 remodeling its office space in order to fit the large piece of equipment it leased from Defendants.

17. The Finance Agreement makes a fine print reference to three different standard form software agreements drafted by Defendants, including a "Software License Agreement," a "Software Solutions Agreement," and a "Professional Services Agreement," (collectively referred to as "Software Agreements").

18. One of the standard form Software Agreements (the Professional Services Agreement) includes fine print stating that the customer (the Fund) may only terminate the agreement if Defendants materially breach the agreement and fail to cure within sixty days following written notice. Otherwise, the Professional Services Agreement provides that the customer must pay the full term of lease if Plaintiffs terminate the contract before the full 60-month term. The Professional Services Agreement provides Defendants more favorable terms for terminating the agreement, including requiring the customer to cure any defect within thirty days of notice, and providing no early termination fee to the Customer in the event of a breach by the Defendants. In contrast, the standard form Software Solutions Agreement provides that Defendants may terminate the agreement immediately if the client is in default, but that the client may only terminate the agreement at the end of the renewal period, and only with 90 days written

4

notice. Therefore the various standard form Software Agreements drafted by Defendants contain incongruous termination terms.

19. Neither the Software Agreements nor the Customized Design Agreements provide the specific terms of payment for the different agreements. Accordingly, the Finance Agreement contains the only terms of payment – $2,815.01 per month – covering all applicable agreements between Defendants and the Funds, (hereafter, all applicable agreements collectively referred to as "Agreement"), including but not limited to, payment for lease of the mailing and postage machine and payment for the customized software that would be integrated for use with the hardware.

20. The Fund has determined that approximate monthly cost of leasing the mailing equipment on its own is $460.46, which the Fund arrived at by calculating the difference between the amount in the final Finance Agreement and the proposed cost of $2,354.55 per month included in a prior draft of the Finance Agreement that Neopost presented before the hardware was added to the agreement. A copy of the first draft of the Agreement is attached hereto as Exhibit B.

21. Under the Customized Design Agreements, (an excerpt of which is attached hereto as Exhibit C) Defendants agreed to the following schedule for the customized software, with the first phase beginning January 3, 2018:

    (i)    Design Phase: 1-4 Weeks

    (ii)    Development Phase: 5-9 Weeks

    (iii)    Implementation Phase: 1-2 Weeks

    (iv)    Launch/Go Live Phase: 1 Week

22. As of July 2018, after paying a total of $22,010.29 under the Agreement, Defendants had not completed the second phase – the Development Phase – under the Customized Design Agreements and the SEIU Funds were unable to print a single document using the customized software that Defendants agreed would be fully functional with the hardware within approximately 8 to 16 weeks of January 3, 2018. The SEIU Funds were limited to using the equipment as a simple postage machine – *i.e.,* printing postage on their manually stuffed envelopes – a function that could have been performed by a much smaller piece of equipment for a fraction of the cost that the Fund was paying to the Defendants under the Finance Agreement.

23. Throughout the different phases in the Customized Design Agreements, and at least 60 days in advance of terminating the contract, the Fund notified Defendants in writing of the software defects and the failures of Defendants to meet the specific agreed-upon deadlines.

24. On July 5, 2018, Plaintiff notified Defendants in writing that it was cancelling the Agreement effective July 2, 2018 because Defendants failed to cure several defects under the Agreement, including failing to meet the software implementation deadlines in the Customized Design Agreement. Plaintiff requested that Defendants send instructions for returning the hardware equipment.

25. Upon receipt of the Fund's notice of termination, Defendants immediately ceased providing all software services to the Fund and sent the Fund a "buy out" letter dated July 17, 2018, contending that the Agreement is "non-cancelable" and demanding $169,792.66 to terminate the Agreement. Defendants failed to provide any instructions for returning the hardware equipment despite Plaintiff's request to return the equipment.

26. The Fund continued to assert its right to terminate the agreement and Defendants' failure to cure defects under the agreement, but Defendants have continued to demand payment of the full 60 months under the Finance Agreement.

27. Plaintiff has $20,878.75 loaded onto a postage account for use with the mailing hardware. Defendants terminated the SEIU Funds' ability to use the hardware equipment, and, notwithstanding Defendants' failure to respond to requests from Plaintiff as to how to return the equipment, Defendants have prevented the Fund from obtaining restitution of the $20,878.75 in Plaintiff's postage account loaded in Defendants' mailing machine.

28. The $20,878.75 on the postage account constitutes assets of an employee benefit plan under ERISA.

29. Defendants have admitted that the amount in the postage account belongs to the Fund.

30. Defendants refuse to release the Fund's deposit in the mailing machine without the Fund paying Defendants' demand for $169,792.66 for the cancellation of the contract and continue to threaten to file suit against the Fund if it does not pay the alleged 60-months penalty for cancellation.

31. The Funds have incurred the following approximate costs as a result of Defendants' breach of the Agreement:

    (i) $1,200 spent remodeling the SEIU Funds' office space to fit the large size of the hardware;

    (ii) $1,100 in server upgrades necessary for running Defendants' software;

    (iii) $15,000 in upgrades to the Fund's claim processing system to make documents compatible with Defendants' software;

    (iv) $12,000 in outsourcing mailing services that the customized software was intended to perform;

  (v)  Approximately $85,000 of in-house labor costs performing the services that the customized software was intended to perform; and

  (vi)  Approximately $17,405 in amounts paid on the software-development portion of the Finance Agreement that was never functional for the Fund.

  (vii)  The unrealized $2,000 per month in mailing and postage savings that Defendants estimated would result from the use of their customized software.

32.  A substantial and justiciable controversy exists between the parties as the Fund believes it is not obligated to pay any additional sums under the agreement due to the material breach by Defendants.

## COUNT I

### Declaratory Judgment Against Defendant that Defendant Breached the Agreement that Plaintiffs had the Right to Terminate the Agreement

33.  The Fund incorporates paragraphs 1 through 32 of the complaint as though fully set forth herein.

34.  By failing to deliver functional customized software by the agreed-upon date, Defendants breached the Agreement.

35.  The Fund properly provided Defendants at least 60 days advance notice in writing of the deficiencies, and Defendants failed to cure.

36.  Defendants' failure to cure within the 60 days was a material breach of the Agreement.

37.  The Fund had the right to cancel the agreement for a material breach after Defendants' failure to provide the customized software within the time required by the Agreement and failure to cure the deficiency within 60 days of the Fund's notice.

38.  The Fund paid Defendants $22,010.29 under the Finance Agreement through the termination date of July 2, 2018, an amount that was based on the delivery and implementation

of the custom software within 16 weeks. Defendants' material breach obligates Defendants to return the payments made by the Fund less the reasonable value of the leased machine without the custom software. The Fund is not required to pay an early termination fee of $169,792.66.

39. In order to meet their various obligations under ERISA and to mitigate their damages from the Defendants' failure to provide the functional software for the mailing and postage machine, the Fund had to contract with alternative vendors and commit more staff resources to handle their mailing and printing needs. Based on the Fund's actions to obtain alternative vendors and the additional in-house labor required to perform the functions that the software was intended to perform, the reasonable value of just the leased machine during the term of the Agreement through July 2, 2018 was only $4,604.60 and Defendants owe the Fund the balance of $17,405, the amount overpaid by the Fund for the custom software and hardware that the Defendants failed to deliver.

WHEREFORE, Plaintiff demands judgment against Defendants and requests the Court to find facts and declare the rights of Plaintiff and Defendants and order relief as follows:

A. Declare that Defendants materially breached the Agreement;

B. Declare that Plaintiff had the right to terminate the agreement effective July 2, 2018;

C. Declare that Plaintiff did not materially breach the Agreement;

D. Declare that Defendants are not entitled to any further payments from Plaintiff under the Agreement;

E. Declare that Plaintiff is entitled to the $20,878.75 deposited in the postage account in Defendants' mailing and postage machine;

F. Declare that Plaintiff is entitled to the amount of $17,405.00 paid to Defendants in excess of the reasonable value of the mailing and postage machine that never contained the custom software promised by Defendants;

G. Order Defendants to take back the mailing and postal machine of Defendants, to pay Plaintiff the $20,878.75 deposited in the mailing and postal machine and to reimburse Plaintiff the excess amount paid to Defendants, $17,405.00 and to pay prejudgment interest on both amounts.

H. Award Plaintiff its attorneys' fees and costs under the Agreement; and

I. Award Plaintiff such other relief deemed just and equitable.

## COUNT II

### Breach of Contract Against Defendants

40. The Fund incorporates paragraphs 1 through 39 of the complaint as though fully set forth herein.

41. By failing to deliver a functional customized software, Defendants materially breached the Agreement.

42. As a direct and proximate result of Defendants' conduct, the Fund has suffered or will suffer significant and substantial damages.

WHEREFORE, Plaintiff demands judgment against Defendants and in favor of the Fund awarding the following:

A. All actual and compensatory damages plus interest through the date of judgment;

B. All consequential damages;

C. All attorneys' fees and costs; and

D. Such other relief deemed just and equitable.

## COUNT III

**<u>Declaratory Judgment that the Agreement's Early Termination Fee is Non-Enforceable</u>**

43. The Fund incorporates paragraphs 1 through 42 of the complaint as though fully set forth herein.

44. Defendants are seeking a $169,792.66 penalty to terminate the Agreement, which amounts to $57,206.26 more than the 48 monthly payments of $2,815.01 remaining on the Finance Agreement. Defendants' excessive demand and threat to sue the Fund if it fails to pay $169,792.66 is frivolous and extortionate.

45. Defendants' demand for an early termination fee in the amount of $169,792.66 is a clear violation of the Agreement given the Defendants' failure to cure their breach of the Agreement within 60 days of the notice of breach served by the Plaintiff.

46. Defendants incurred no actual damages in the early termination of the Agreement. Any early termination fee would result in unjust enrichment to the Defendants.

47. Even if Defendants could prove any actual damages resulting from the Fund's early termination of the Agreement, Defendants damages would have to be offset by the damages caused to the Fund by Defendants' breach of the Agreement and failure to deliver the contracted functional software after the 16 weeks provided in the Agreement and after nearly a full year of payments by Plaintiff on the contract and also by the amount Plaintiff had to pay to alternative vendors to provide the services that Defendants failed to deliver.

WHEREFORE, Plaintiff demands judgment against Defendants and requests the Court find and declare the rights of Plaintiff and Defendants as follows:

A. Declare that the early termination fee in the Agreement is unenforceable;

B. Declare that Defendants are not entitled to any further payments under the Agreement;

    C.    Award Plaintiff its attorneys' fees and costs under the Agreement; and

    D.    Award Plaintiff such other relief deemed just and equitable.

## COUNT IV

### Request for Injunctive Relief for Breach of Fiduciary Duty

48. The Fund incorporates paragraphs 1 through 47 of the complaint as though fully set forth herein.

49. Defendants are holding $20,878.75 of benefit plan assets in a postage account that belongs to the Fund.

50. Defendants are refusing to release the amounts in the postage account unless the Fund pays an early termination fee of $169,792.66.

51. By exercising control over the $20,878.75 in the postage account, Defe8.45ndants are acting as a fiduciary under ERISA within the meaning of 29 U.S.C. § 1002(21)(A).

52. Fiduciaries of the Fund must act "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a).

53. By refusing to release plan assets to the Fund in order to leverage a settlement payment from the Fund, Defendants are breaching their fiduciary duties because Defendants are not acting solely in the interest of plan participants and their beneficiaries and because Defendants are failing to act for the exclusive purpose of defraying reasonable expenses of administering the plan, in violation of 29 U.S.C. § 1104(a)(1)(A).

54. Defendants are acting in further violation of 29 U.S.C. § 1104(a)(1)(A) by continuing to demand payment of an early termination fee and threatening a lawsuit against Plaintiff. Payment of an early, excessive and unearned termination fee amounting to more than four years' worth of payments on a lease agreement from which the Fund derives no benefit and which would be paid from plan assets intended for health, welfare and pension benefits, is clearly against the best interests of plan participants and beneficiaries of the Fund and amounts to self-dealing by Defendants in violation of 29 U.S.C. § 1106(b)(1) and (2).

WHEREFORE, Plaintiff demands judgment against Defendants and requests the Court to find facts and order relief as follows:

A. Find that Defendants are fiduciaries of the Fund in controlling deposited assets of the Fund and are breaching their fiduciary obligation by refusing to release the $20,878.75 in the Fund's postage account;

B. Find that Defendants are acting in violation of 29 U.S.C. § 1104(a)(1)(A) by refusing to release the $20,878.75 deposited in the Fund's postage account;

C. Find that Defendants are acting in violation of 29 U.S.C. § 1104(a)(1)(A) and 29 U.S.C. § 1106(b)(1) and (2) by threatening to sue the Fund if it does not pay the disputed early termination fee under the Agreement with the Fund;

D. Find that Defendants are acting in violation of 29 U.S.C. § 1104(a)(1)(A) and 29 U.S.C. § 1106(b)(1) and (2) by refusing to release the $20,878.75 in the Fund's postage account unless the Fund pays the Defendants' the disputed claim for an early termination fee under the Agreement with the Fund;

E. Order Defendants to pay to the Fund the $20,878.75 deposited in the Fund's postage account;

F. Enjoin the Defendants from continuing to pursue any further payments under the Agreement and order the Defendants to remove their mailing and postage machine from the Fund's office;

G. Award the Fund its attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(1); and

H. Award the Fund such other relief deemed just and equitable.

Respectfully submitted,

./s/ Elizabeth L. Rowe
Elizabeth L. Rowe
One of Plaintiffs' Attorneys

Josiah A. Groff (ARDC# 6289628)
Elizabeth L. Rowe (ARDC# 6316967)
DOWD, BLOCH, BENNETT, CERVONE,
    AUERBACH & YOKICH
8 S. Michigan Ave. – 19th Floor
Chicago, IL 60602
312-372-1361